Bradbury, J.
No joint judgment was rendered in the circuit court against the plaintiffs in error, nor could any such judgment have been rendered, for the claim against each was several. A several judgment, therefore, was rendered against each of the plaintiffs in error, in favor. of the receiver of the association, for the amount found by the referee to be severally due from each of them as stockholders thereof. These plaintiffs in error joined in one, petition in error to this court, instead of each filing a separate petition, as it is contended they should have done ; and, for this reason, it is now insisted by defendants in error that the petition in error should be dismissed. It is no doubt true that the code of civil procedure does not permit, as a rule, persons to be joined as plaintiffs who are not united in interest, but it is not necessary to determine, in the case before us, whether or not the plaintiffs in error could join in obtaining the relief demanded, or if they could not, what remedy ought to have been applied if the objection had been promptly made, for the joinder affects no substantial right of the defendants in error, and the failure to interpose this objection for three years, and until the cause had been prepared and ready to be submitted on its merits, must be taken to constitute a waiver of any right they may have had in respect thereof. It would be a severe rule, indeed, that would visit with the penalty of dismissal at this late day a mistake so easily remedied, if the parties now complaining of it had pointed it out at an early stage of these proceedings in error.
The parties to this action in the courts below numbered about five hundred; they were all included in the petition in error filed in this' court, but no summons in error was issued thereon. The receiver, however, in whose favor the several judgments now sought to be reversed were rendered, entered his appearance. The appearance of all the outside creditors was also entered, as was that of a considerable number of the stockholders, yet, when all this was done, there remained a numerous body of the stockholders who are not before this court. Upon this ground the defendants who are before the court, on the authority of Smetters v. Rainey, 13 *255 Ohio St. 568, and the same case, 14 Ohio St. 287, insist that as the statute of limitations has run in favor of those defendants who did not enter an appearance, the cause should be dismissed for want of proper parties. We think the principle underlying those cases — Smetters v. Rainey, supra— should not be extended; since that principle was announced, it has been generally criticised and its application limited whenever under consideration by this court: Bradford v. Andrews et al., 20 Ohio St. 220; Secor v. Witter, 39 Ohio St. 218; Bank v. Green, 40 Ohio St. 438.
Beyond doubt, good practice requires that, all parties to the judgment below, who may be affected in any way by the judgment of this court, should be before it, and serious inconvenience and embarrassment might result from their absence; but, if the court has acquired jurisdiction of the cause, the absence of parties who may be affected does not necessarily demand a dismissal thereof. The proper course to pursue in such case must depend upon the exercise of a sound discretion under all the circumstances before the court. In the case before us the judgment or decree was somewhat singular. A several judgment was rendered against each one of a large number of shareholders, not upon their statutory liability, but for money paid or distributed to them, severally, beyond the amounts which they were respectively entitled to receive upon a pro rata distribution of the. assets of the concern. These judgments aggregate over $46,000, while the debts to be paid and the costs altogether amount to a little more than $15,000, and the aggregate sjim of the judgments against the plaintiffs, does not very much, if at all, exceed $6,000; so that, if their defense is held good, there will still remain judgments for about $40,000 with which to pay $15,000. If the insolvency of some of those, against whom these judgments were rendered, was the ground upon which the seemingly excessive judgments were rendered, it is not sufficiently disclosed in the record. The judgment or decree of the circuit court, made no provision for the distribution of the surplus remaining in the hands of the receiver after the debts and costs were paid, and the case *256 remains in that court for further proceedings in reference thereto, as well as for certain other matters not material to the enquiry before us. The discharge of the plaintiffs in error, therefore, will cause no inconvenience or embarrassment in the circuit court. That court will simply have before it eighteen less persons to whom to distribute this surplus, and a sum to distribute reduced by the aggregate amount of the judgment against these plaintiffs in error ; but if any inconvenience or embarrassment should ensue, the defendants who are before the court after this lapse of time must be deemed to have brought it on themselves, for they had ample time, before the statute of limitations had run, to move this court to require the plaintiffs in error to bring in all the defendants or obtain leave to do so themselves. The defendants, therefore, who are before the court, have no standing to require a dismissal of the petition in error, if the court obtained jurisdiction of the action.
That the parties before this court were such as to give it jurisdiction, is, we think, quite clear. The receiver, in whose favor the judgments sought to be reversed were rendered, and the creditors proper of the association, as well as a portion of the stockholders, have entered their appearance. Indeed, it would seem that, the form of the judgments are such that the appearance of the receiver alone, he being the party, and the only party, in whose favor the judgments were rendered, would be sufficient to give jurisdiction. He is the representative of the other parties and whatever rights they have must be worked out through him; he is the party to whom the judgments are payable; he only could enforce them, and, for these reasons, we think, he is the proper party to defend them in this proceeding.
The main contention between the parties arises on that part of the report of the referee, wherein he held, that the plaintiffs in error remained stockholders of the association, and adjusted the rights of the parties on that theory, notwithstanding they had, nominally, at least, compromised with, and surrendered to, the association, the shares of stock Held by them. This holding was based upon the theory that *257 the regulations adopted by the association, under which the' surrender of stock was made, was unauthorized, ultra vires and void, and that, notwithstanding the transaction which led to the surrender of the stock was completely executed, and the shares of stock, in fact, surrendered, yet, there was no equity in favor of the shareholders by which the transaction could be upheld. The material circumstances of the transaction are as follows: The capital stock of the concern was $400,000, which was divided into two thousand shares of two hundred dollars each; that the constitution of the concern provided that funds should be raised by monthly dues of one dollar per share, fines for non-payment of dues, and interest on loans advanced to members; and that it should continue in operation until sufficient funds should be realized to divide to each share two hundred dollars or its equivalent, at which time the association should be dissolved; that as money accumulated sufficient to redeem one or more shares it should be loaned from time to time to the member offering the highest premium therefor, and this in effect was a redemption in advance of the share or shares of stock upon which the loan was made. The borrower (so called) giving security for the payment of the interest on the money loaned, his monthly dues and fines that might be assessed against him, but not for the repayment of the money advanced to him, as its repajunent was not contemplated by the scheme of the ■ association. The constitution did not contain any provision authorizing its amendment, but authorized provision to be made by by-laws respecting shareholders who might withdraw from the association, and a by-law was adopted, at the time of adopting the constitution, providing for the withdrawal of members, which was never formally repealed, and which only differed from the regulations under which plaintiffs in error withdrew, by fixing a rate more advantageous to the association. This constitution and the by-laws, as originally adopted, were signed by each subscriber for stock. The association continued to loan its money (or more properly, to redeem its stock) to the person bidding the highest premium therefor, until January, 1871, *258 at which time (January 2, 1871) the stockholders adopted a resolution authorizing the purchase, as it was called, but, in fact, the cancellation and retirement, of such shares of stock as could be had at a premium of twenty per cent, on the amount paid in; in like manner on January 16, 1872, the rate for retiring stock was fixed at thirty per cent.; on January 13, 1873, it was fixed at forty-five per cent, for sixty days, and forty per cent, for the balance of the year; and on January 5,1874, the rate was fixed at sixty per cent. These rates were fixed without any objection, so far as the record discloses, nor does it appear that they were the result of any device, trick or misrepresentation of any kind, or that those rates, in the apparent condition of the association at the time, were unduly favorable to those who wished to retire. It was under these resolutions that the shares of the plaintiffs in error were taken up and retired before the claims accrued for which they are sought to be held, and about four years before this action was commenced. The referee construed the transaction to be both a purchase of the stock by the association, and a division of its funds in advance of the time provided for by its constitution. This view we have not been able to adopt. The transaction was not' a purchase in the correct sense of that term. A purchase implies an acquisition of property, a change or transfer of ownership. Bouvier, 488. This was not within the contemplation of the parties to the transaction; it was not intended that the shares should be kept alive (so to speak) and remain the property of the association; on the contrary, the object sought was their extinguishment by retirement and cancellation, and we see no reason for imposing on the transaction any other character than that intended by the parties themselves. Nor did the parties intend a division of the funds of the concern in advance. The parties who went out expressly waived any right in the ultimate division contemplated by the constitution of the association, in consideration of receiving, at the time, a sum agreed upon by the parties. The object of the association was to reduce the number of shares among which final division should be *259 made when the funds should be sufficient to divide two hundred dollars per share, and this cancellation of stock was a means, as they supposed, of hastening that day, for the rate at which stock should be cancelled was no doubt fixed somewhat below its real value, as the same was measured by the existing assets of the concern at the value put upon them by the association at the time.
The nature of the transaction must be determined by the understanding of the parties, and the situation as it appeared to them at the time it was entered into, and the fact that some years later, either through the mismanagement of those who remained in and participated in conducting its business) or for some other cause it turned out that the association retired these shares at too high a rate, does not affect the question. Therefore, we hold the transaction to be a compromise with shareholders and a retirement of their stock,- and the power to do this, we think, is incidental to all building and loan associations organized under the laws of this state. The expressed object of their creation is to afford means to build homes for their members. The law must be taken to have anticipated the exigencies that are likely to arise in the affairs of life. The membership in these associations • is usually quite numerous ; in this association it was’ over five hundred; its duration was to exceed eight years. A multitude of causes can be imagined Which would render it highly inconvenient, and many that would make it altogether impracticable, for some of this large number of shareholders to remain members until its existence should termi-' nate by a division of its assets according to its constitution; in such case they must either take the chances of a sale to some individual, or compromise with the association. The right of an association of this kind, to compromise with a member and release him, is declared in State v. Building Association, 35 Ohio St. 258, and we reiterate the doctrine there laid down.
Notwithstanding this general power of building and loan associations, to compromise with their shareholders and release them from liability, it is not doubted that they can be limited *260 by their own internal regulations, and this, it is contended, has been done by the constitution and by-laws adopted by this association. It is further contended that, as the constitution and by-laws of this association, after their adoption, were signed by all its stockholders, they became a part of the contract which could not be changed, as we understand counsel, except by unanimous consent. We do not perceive any ground to maintain that the constitution and by-laws are any more binding, because signed by the members, for, whether signed or not, they become the law of the association, binding upon all of its members, until altered or amended, and the circumstance that they were signed does not take away the right and power of amendment, which is incidental to all corporations.. Notwithstanding the statement in Waterman on Corporations, 234, and cases cited in support of it, we do not doubt that the constitution of a corporation may provide that it, or the by-laws, shall not be altered or amended without the consent of all, or some fixed proportion, of the members, in which case, an amendment or alteration, to be binding, must secure the assent of the stipulated number; but this constitution contained no such provision. It, in fact, contained no provision, whatever, in relation to its amendment; this omission, however, did not take from it the power to amend, with which it was clothed by the law of the state. Section 3253, Revised-Statutes. But, were this not so, it would not aid the defendants in error in this case, for the constitution in express terms provided “ that the by-laws of the society should make such provision as may be deemed expedient and proper with regard to shareholders who may for various causes withdraw from the society.” Accordingly, a by-law was, at the same time, adopted, providing that the holder of unredeemed shares might withdraw, and fixing the terms at five per cent, less than he had paid in, and his proportion of the losses and expenses. Thus it appears, not only that the constitution and by-laws did not deny the right of withdrawal, but on the contrary expressly recognized and provided for its being done.
The association having the power to compromise with its *261 members and retire their stock, the only question that remains is whether this power was fairly and reasonably exercised or not. It is said that the power was not fairly and reasonably exercised, because the retiring members received too much, as the ultimate result proved; that is, the association fixed the rate of redemption too high. That cannot be allowed to be the test of the fairness of a transaction. The stockholders of the association at four successive annual meetings adopted a resolution, without dissent or opposition, fixing the rate at which any holder of unredeemed stock could, if he chose, retire from the concern. There is no suggestion that any undue influence, misrepresentation, ruse or device of any kind was employed to secure the adoption of these resolutions. There is no ground to suppose that these rates were fixed for any other reason than the general belief that the accumulations of the association warranted it. These standing rates were accepted by the plaintiffs in error (among others), and their respective shares of stock retired more than four years before this action was begun, during all which time they had no actual connection with the association or interfered in any way with the management of its concerns. Under these circumstances, we think the transaction must be deemed a fair one. It is not clear how the affairs of the association fell into such confusion; one potent cause, no doubt, was the decision of this court against its claim to charge interest on the premium bid by shareholders for precedence in obtaining money, and the resultant discouragement. The Forest City United Land and Building Association v. Gallagher et al., 25 Ohio St. 208. To hold, that in order to make a compromise with, and discharge of a member fair, it should appear at the ultimate winding up of the affairs of the concern, that too much had not been paid him, would be to defeat all efforts at compromise, for no member would care to withdraw upon such terms. He would be placed in this situation. If, in the end, it appeared, that the association had secured a good bargain, the transaction would stand; but if it had paid him too much, it could call for a readjustment of the accounts, if it saw proper so to do, either before *262 or at the time of its final dissolution. This cannot be allowed. The power to compromise implies a power to bind both parties by the terms agreed upon, though they prove highly advantageous to one party and equally detrimental to the other, in the absence of fraud or some other recognized ground of equitable relief.
Judgment reversed, and judgment rendered for plaintiffs in error.